UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D. RODNEY ROGERS,

Plaintiff,                   Civil Action No. 16-12735
Honorable Linda V. Parker
v.                                           Magistrate Judge David R. Grand

MATTHEW RYAN, SERINA KELLEY,
JEFFREY MORIN, RAY SAATI,
and MICHAEL O. BROWN,

Defendants.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION TO
## AMEND STATEMENT OF CLAIMS AGAINST
## EACH DEFENDANT IN THEIR INDIVIDUAL CAPACITY [164]

### and

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [115]

*Pro se* plaintiff Rodney Rogers ("Rogers") is a State of Michigan prisoner, who is

currently confined at the G. Robert Cotton Correctional Facility in Jackson, Michigan.   He

brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Matthew Ryan,

Serina Kelley, Jeffrey Morin, Ray Saati, and Michael Brown[1] (collectively "Defendants"), all of

whom are or were members of the Detroit Police Department ("DPD"), alleging, *inter alia*,

excessive force, unlawful detention, and deliberate indifference to a serious medical need.   On

August 19, 2016, this case was referred to the undersigned for all pretrial purposes.   (Doc. #9).

On August 31, 2018, Defendants filed a motion for summary judgment.   (Doc. #115).

Rogers filed responses in opposition to Defendants' motion on October 2 and 11, 2018.   (Docs.

---

[1]

  On November 19, 2018, Rogers filed a Second Amended Complaint, adding claims against
Defendants Ray Saati and Michael O. Brown.  (Doc. #137).  It does not appear, however, that either
of these individuals has been served with process in this case.  Therefore, by separate order, the
Court will direct marshal service on these two individuals.

#123, #124).  No reply was filed.

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. L.R. 7.1(f).  Having reviewed the pleadings and other papers on file, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

## I.   REPORT

### A.   Factual Background[2]

The instant case centers around events which took place on July 19, 2013, at 8181 House, in Detroit.  At the time, Rogers was on parole and had been living with Yvette Taylor and several children.  (Doc. #115-6 at 23).  On the evening in question, Rogers left his home at night with a friend to go to a "strip club."  (*Id.* at 51).  When he returned home, Taylor asked him "what did you do with the money" they had saved to pay bills.  (*Id.* at 54).  He told her, "I took the money and I went out and had me a good time."[3]  (*Id.* at 54).  Taylor became upset and asked Rogers to leave the home.  He refused to leave, at least immediately, and instead attempted to "get [his] things."  (*Id.* at 56-57).  Rogers claims that Taylor prevented him from doing so, so he called the police and told them that Taylor "wouldn't let me get my things and I needed assistance[.]"  (*Id.* at 57).  Officers Serina Kelley and Michael Conley arrived at some point thereafter and, with Rogers and Taylor both still inside, approached the house.  The front door was closed at that time.

Other than Rogers' sobriety on the night in question, Defendants do not seem to dispute

---

[2] **On April 1, 2019, Rogers filed a "Motion to Amend Statement of Claims Against Each Defendant in Their Individual Capacity."  (Doc. #164).  In that motion, Rogers indicates a desire to clarify the claims he is pleading against each individual defendant.  No response was filed to this motion; presumably, then, Defendants do not oppose the relief requested.  Thus, Rogers' motion to amend (Doc. #164) is GRANTED.**

[3] Rogers testified that he spent the money on "strippers," but that he did not drink any alcohol or use any drugs that night, and that he was "stone cold sober."  (Doc. #115-6 at 54, 56).

any of the foregoing.  What happened next, however, is heavily disputed.  The Court will begin with Rogers' version of the facts.

### 1.    *Rogers' Version of the Facts*

Rogers testified that he heard walkie-talkies on the porch and told Taylor that police had arrived, and that she needed to give him his things or she would be going to jail.  (*Id.* at 59-60). He went to the front door, opened it, and told the officers that he "was in the process of getting my things, and [] closed the door."  (*Id.* at 60).  According to Rogers, he then retreated into the home "to try to convince [Taylor] to give me my things."  (*Id.* at 61).  Rogers testified that Taylor then stabbed him with an 8-inch long steak knife in the shoulder and forearm.  (*Id.* at 62). He grabbed her hands to try to keep her from further stabbing him, and ultimately was able to get her to drop the knife.  (*Id.* at 62, 66, 68).  Rogers claims that he was "screaming for help" and that Taylor was screaming "let me go, let me go."  (*Id.* at 67).  Rogers further claims that Officer Kelley had been able to peer into the living room through a window and observe the situation. (*Id.* at 66-67).  Rogers claims that he yelled to Kelley, "Officer, she just stabbed me.  She has a knife."  (*Id.* at 67).

Rogers testified that he then "exited out of the house as quickly as possible out of the front door" and came into contact with Officers Conley and Kelley either on the front porch (as Rogers first testified) or around the area of the driveway (as he later testified).  (*Id.* at 68, 70-76). He told them he had been stabbed, which they acknowledged, and they told him to wait in the driveway.  (*Id.* at 72-73).  Rogers claims that Kelley then went to talk to Taylor and other officers arrived on the scene.  (*Id.* at 76).  According to Rogers, he stood there in the driveway, surrounded by officers, "[s]creaming for help" and "trying to explain [] what was going on." (*Id.*).  He told them he had been stabbed, had lost a lot of blood, and was having trouble

breathing.  (*Id.*).

Rogers claims that one of the officers said he was going to find out what was going on, and another said "there were no medics in the area" and that "[n]o medics were coming[,] period."  (*Id.* at 77).  Rogers claims that he asked the officers if he was under arrest, and that they told him "no."  (*Id.* at 79).  Rogers testified that, "[a]t that point, [he] made an attempt to go toward [his] neighbor's home" "and have them call for medics."[4]  (*Id.* at 77-78).  Rogers claims, "that's when [] Sergeant Ryan grabbed me from behind and threw me to the ground."  (*Id.* at 77).[5]

Rogers testified that the officers on scene then began "screaming and hollering" at him, telling him to "lay face down on the ground" and to put his hands behind his back.  (*Id.* at 79, 94).  Rogers claims he then told the officers that he had been stabbed and had rods in his right ankle that prevented him from laying face down on the ground.  (*Id.* at 81).  Rogers claims that Lieutenant Morin, Officer Conley, and Sergeant Ryan then began punching and kicking him in his side, legs, and head.  (*Id.* at 82, 94).  He claims the officers eventually secured his hands behind his back through the use of "pain compliance techniques" and handcuffed him.  (*Id.* at 92).  Rogers claims that after he was handcuffed, Sergeant Ryan mashed his face into the ground, and that "[y]ou could see all the way down to my – all the skin was gone off from my face."  (*Id.* at 93).

Rogers was then placed under arrest and transported to Detroit Receiving Hospital ("DRH") by Defendants Morin and Brown, where he received medical treatment for his injuries. He claims that, during that period of time, Sergeant Saati was dispatched to the crime scene to

---

[4] Rogers later similarly testified that he "was trying to go next door to my neighbor's house to call for medics to take me to the hospital because it appeared that the officers were not going to call medics for me, nor did officers offer to take me to the hospital."  (Doc. #115-6 at 91).

[5] While not entirely clear, Rogers' testimony seems to be that Ryan did not ask him to "stop" as he was walking towards the neighbor's house.  (*Id.* at 80-81).

conduct an investigation.   Rogers alleges, however, that Sergeant Saati "failed to collect exculpatory evidence of the brutal assault against [Rogers] such as the butcher's knife Taylor stabbed [him] with" and otherwise failed to investigate the situation so as to prove that Rogers "was a victim of a violent assault and NOT the perpetrator" – information he claims was "critical to [his] innocence[.]"  (Doc. #137 at ¶¶ 13-15 (emphasis in original)).

On July 20, 2013, Rogers was transported by two unidentified officers from DRH to DPD's 11th Precinct, where he was booked on charges of aggravated/felonious assault and resisting an officer.  Rogers appears to allege that, the same day, the Wayne County Prosecutor's Office dismissed these charges for lack of probable cause.  Nevertheless, Rogers apparently remained in DPD custody until July 22, 2013, when he was turned over to the Michigan Department of Corrections on charges that his conduct on the night in question violated his parole.  Rogers further alleges that Defendants Kelley, Morin, and Ryan submitted false incident reports to his parole officer, Edward Parker; failed to disclose to Mr. Parker that he was "a victim of a violent assault"; and then offered perjured testimony at his November 2013 parole revocation hearing, resulting in the revocation of his parole and his reincarceration.

### 2.  *Defendants' Version of the Facts*

Both Officer Kelley and Sergeant Ryan prepared Arrest Reports detailing the events in question, though they cover slightly different aspects of the incident.  In her Arrest Report, Officer Kelley wrote:

> [Officers] made location and observed the front door opened as writers stepped onto the front porch and announced our presence[.]  [Taylor] appeared[.]  [Officers] asked if she called the police.  As [Taylor] began to talk [Rogers] appeared pushing [Taylor] out of the view of [officers] at which time he shut and locked the front door deadbolts.  [Kelley] then heard [Rogers] yelling in the house that they were coming to kill him and that he had been smoking crack cocaine.  [Taylor] was able to open the front door and began to tell [officers] that [Rogers] had arrived at the location acting

strange and telling her that demons were after him[.]  As she continued to speak with [officers,] [Rogers] then appeared again grabbing [Taylor] by the shoulders and proceeded to slam the front door again.  [Officers] could hear the loud disturbance from outside and immediately called for additional units and the Patrol Supervisor.  [Kelley] began to push on the front door but was unable to gain entry[.]  [Kelley] then heard [Taylor] yelling and screaming[.]  Observing the front French glass doors [] suddenly break [officers] could see through the window [Rogers] holding [Taylor] in what appeared to be a bear hug.  [Kelley] made several attempts to get inside but was unable[.]  [Kelley] could hear [Taylor] yelling at [Rogers] to release her.  [Rogers] was then heard yelling that he was stabbed appearing at the front door with the security door still locked and blood observed on his shirt.  [Rogers] still had [Taylor] in his grasp dragging her towards the side door [where] [sic] both individuals fell from inside the home onto the ground in the driveway.  [Taylor] was able to free herself and run back into the home securing herself.  [Rogers] began to run toward the rear of the location in the backyard at which time he jumped the fence into the yard of 8175 House.  [Officer Conley] gave chase and proceeded behind [Rogers] along with the additional [officers] that made location.  [Kelley] ran back to 8181 House to check on [Taylor] . . . As [Kelley] stood with [Taylor] [Kelley] observed [Rogers] standing in the driveway of 8127 House surrounded by [Conley and the other officers].  [Rogers] was bleeding from his left forearm appearing to be disoriented and confused yelling at [the officers] not to shoot him.  [An officer] made several attempts to calm [Rogers] down assuring him that he wasn't going to be harmed.  [Kelley] then observed [Rogers] run west on House as Officers followed behind giving loud verbal commands to stop.  Medics were requested several times but no units were available . . . [Rogers] was later detained and conveyed to [Detroit Receiving Hospital] . . . [Taylor] refused treatment[.]

(Doc. #115-3 at 1).

In his Arrest Report, Sergeant Ryan describes the events that transpired as follows:

On Friday, July 19, 2013 at approximately 3:50 a.m., I, Sergeant Matthew Ryan … responded to 8181 House.  [Officers Serina Kelley and Michael Conley] had responded to a domestic assault person armed with a gun and was requesting cars for back up.  I arrived at scene and observed a black male (Rodney Rogers) standing in the driveway of 8127 House surrounded by several officers.  Mr. Rogers had a severe cut on his left forearm that was bleeding profusely and appeared to be disorientated.  Officer Conley informed me of the situation and I attempted to calm Mr. Rogers down by asking him to calm down and assuring him that no one was going to hurt him.  Mr. Rogers explained that he had been smoking crack and had gotten too high.  After several more minutes of trying to calm Mr. Rogers down, he ran west bound on House.  I followed and gave Mr. Rogers several orders to stop[.]  Mr. Rogers continued to run yelling

they are going to kill me.  Mr. Rogers then ran south in the driveway of 8140 House.  As Mr. Rogers reached the rear of the yard he slowed, while he was trying to get through an opening in the broken fence.  I gave Mr. Rogers a loud verbal command to stop, but he continued to break through the fence.  I grabbed the back of Mr. Rogers tank top as he went into the alley.  Mr. Rogers then turned with a balled fist swinging and trying to strike me in the face, I moved back and was struck in the left shoulder.  I then pushed Mr. Rogers in the right shoulder causing him to fall to the ground.  I grabbed his right wrist and attempted to pull it behind his back but was unable to.  I then placed one knee in the center of Mr. Rogers back and continued to pull on his arm trying to place it behind his back.  Officer Morin was also pulling on his arm and was able to place a cuff on his right wrist and pull it behind his back.  I gave Mr. Rogers several verbal commands to place his other hand behind his back but he did not comply[.]  Mr. Rogers continued to struggle by trying to stand and pulling his left arm up under his bodO.  Officer Conley was able to pull Mr. Rogers left arm out from under him and he was placed in cuffs.  Mr. Rogers had sustained a severe stab wound to his left arm prior to the use of force incident and was bleeding badly[.]  Due to Mr. Rogers wound and his mental state I ordered [him] convey[ed] directly to [Detroit Receiving Hospital].

(Doc. #115-1 at 1).

In this civil action, Rogers appears to plead several claims against Defendants, including excessive force, unlawful detention, false arrest, deliberate indifference to a serious medical need, failure to investigate, filing of false police reports, providing false testimony at an administrative hearing, assault and battery, conspiracy, gross negligence, and intentional infliction of emotional distress.  (Docs. #1, #28, #137).  Defendants now move for summary judgment.

**B.    Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court

assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

#### 1.    *Many of Rogers' Claims are Barred by* Heck

Defendants first argue that several of Rogers' federal civil rights claims, which are brought pursuant to 42 U.S.C. § 1983, are barred by the United States Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994).  (Doc. #115 at 11-19).  In *Heck*, the Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at 486-87 (footnote omitted).  Courts have recognized that, "[t]he principles espoused in *Heck*

have been applied to § 1983 actions like Plaintiff's, challenging state parole revocation proceedings in the absence of a previous decision by a state or federal tribunal declaring the parole revocation invalid." *Delong v. Hudechek*, No. 16-176, 2016 WL 878055, at *2 (W.D. Mich. Mar. 8, 2016) (citing cases); *see also Smith v. Taylor-Pedersen*, No. 17-11532, 2018 WL 2376567, at *4 (E.D. Mich. Apr. 30, 2018); *Norwood v. Mich. Dep't of Corr.*, 67 F. App'x 286, 287 (6th Cir. 2003).   In other words, where Rogers' allegations of civil rights violations inherently, if successful, would invalidate the revocation of his parole, such claims cannot go forward.   For the reasons set forth below, the Court finds that some[6] of Rogers' federal civil rights claims are barred by *Heck*.

On February 25, 2014, the Michigan Parole Board revoked Rogers' parole after finding him guilty of engaging in behavior that was "assaultive, abusive, threatening and/or intimidating" when he held Taylor against her will; engaging in behavior that was "assaultive, abusive, threatening and/or intimidating" when he attempted to strike Sergeant Ryan with a

---

[6] In their motion, Defendants argue, *inter alia*, that Rogers' § 1983 excessive force and common law assault and battery claims are barred by *Heck*.  (Doc. #115 at 14-19, 31-32).  Specifically, Defendants assert that:

> The statutory basis upon which Plaintiff was arrested and found in violation of his parole – MCL § 750.81(d) – was formed by his attempted strike of Sergeant Ryan and his flight from arresting officers…. In other words, Plaintiff's parole was violated on the basis that he assaulted an officer under the statutory basis articulated in MCL § 750.81(d).  And again, for purposes of the *Heck* bar, the violation of Plaintiff's parole on this basis operates as a conviction.

(*Id.* at 14).  However, numerous courts in this district have consistently rejected such an argument, concluding that "a conviction under [Michigan's] resisting-arrest statute [MCL § 750.81(d)] does not trigger *Heck's* bar to a § 1983 excessive-force suit." *Flanigan v. Panin*, No. 15-12504, 2017 WL 5709588, at *5 (E.D. Mich. May 2, 2017) (internal quotations omitted); *see also Hawkins v. Detroit Pub. Sch.*, No. 16-10316, 2017 WL 2951627, at *4 (E.D. Mich. May 5, 2017), report and recommendation adopted, 2017 WL 2962876 (E.D. Mich. July 12, 2017); *Donald v. Cieszkowski*, No. 17-12190, 2019 WL 2866493, at *4-6 (E.D. Mich. July 2, 2019) (citing multiple recent decisions).  Thus, Defendants' argument that Rogers' excessive force and assault and battery claims are barred by *Heck* is without merit.

closed fist; and engaging in behavior "which constitutes a violation of State law when [he] fled on foot" from DPD officers during the course of a criminal investigation.[7]  (Doc. #123-1 at 61). In reaching these conclusions, the Parole Board specifically found credible the testimony of Officer Kelley, Lieutenant Morin, and Sergeant Ryan.  (*Id.* at 63-65).

In relevant part, Rogers now asserts § 1983 claims for: (1) "arresting Plaintiff unlawfully, and falsifying police reports in order to charge him with crimes knowing them to be false"; (2) failing to "properly investigate a major crime committed by Ms. Taylor against the plaintiff" (including failing to "seal off the area to collect 'EVIDENCE' such as the knife the plaintiff was assaulted with"); (3) failing to "disclose the fact that the plaintiff was the victim of a domestic violence attack"; and (4) "testifying falsely at an administrative parole violation hearing …." (collectively, the "*Heck*-barred claims") (Doc. #28 at ¶¶ 42, 43; *see also* Doc. #137 at ¶¶ 15, 20, 21).  All of these claims, however, are barred by *Heck* because a finding in Rogers' favor on them would, necessarily, imply the invalidity of his parole revocation.

Specifically, Rogers' assertions that Defendants made "false and misleading statements"

---

[7] Although Defendants do not raise the issue (either in their summary judgment motion or in their affirmative defenses filed in their initial responsive pleadings), the Court has considered whether the principle of defensive collateral estoppel prevents Rogers from offering testimony that conflicts with factual findings made by the adjudicator of his parole hearing.  The principle of collateral estoppel, or issue preclusion, may be "asserted defensively to prevent a party from relitigating an issue that such party has already had a full and fair opportunity to litigate in a prior suit." *Autrey v. Stair*, 512 F. App'x 572, 578 (6th Cir. 2013) (citation omitted).  "As the Sixth Circuit has noted, when arguing for the application of defensive collateral estoppel [] the party seeking to accord preclusive effect to a prior court determination must establish that: 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Id.* (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir.2001)).  At least on the present record, the Court cannot find that application of the defensive collateral estoppel doctrine would be proper here; at a minimum, it is unclear whether Rogers was afforded an opportunity to conduct discovery in connection with his parole hearing, and it appears he was not provided a court-appointed attorney to represent him in that matter.

in their police reports, in order to charge him with crimes he did not commit, go directly to the propriety of the parole revocation decision.  Similarly, Rogers' allegations that Defendants wrongly cast him as the perpetrator instead of the victim call into question the validity of the Parole Board's finding that he engaged in "assaultive, abusive, threatening and/or intimidating" behavior toward Taylor.  And, if the Court were to agree with Rogers that Defendants presented perjured testimony at his parole violation hearing, such a finding would call into question the Parole Board's decision to revoke Rogers' parole for engaging in assaultive or threatening behavior.  Since Rogers does not assert – and, indeed, there is no evidence – that his parole revocation has been reversed by the Michigan state courts, called into question by a federal writ of habeas corpus, or otherwise terminated in his favor, the *Heck* doctrine bars this Court from considering these claims.[8]  Thus, Defendants are entitled to summary judgment with respect to the *Heck*-barred claims.

### 2. Rogers' Excessive Force, Assault and Battery, and Negligence Claims

Defendants have moved for summary judgment with respect to Rogers' claim that the actions of Ryan, Morin, and Brown constitute excessive force.  (Doc. #164 at 4-10).  Rogers bases this claim on his testimony that: (1) Ryan grabbed him and threw him to the ground as he tried to walk to his neighbor's home to call an ambulance for his bleeding arm; (2) Ryan, Morin, and Brown punched, kneed, and kicked him while he was on the ground, and used "pain compliance techniques" to handcuff him; and (3) Ryan mashed his face into the ground after he was handcuffed.  Rogers also brings a claim against Officer Kelley, alleging that she failed to

---

[8] To the extent Rogers alleges claims against Defendants for "Conspiring to File False Charges" and/or false arrest under Michigan law, such claims also are barred by *Heck*.  Because Rogers' arrest resulted in his conviction on the parole charges, he cannot prevail on these claims.  *See Norwood*, 67 F. App'x at 287 (plaintiff's allegation that defendants conspired to revoke his parole was barred by *Heck*); *Bell v. Biven*, No. 12-15077, 2019 WL 1785352, at *5 (E.D. Mich. Apr. 24, 2019) (plaintiff's claim for false arrest under Michigan common law was barred by *Heck*).

intervene in or prevent such use of excessive force.

### a.  The Applicable Legal Standards

Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances.  *See Graham v. Connor*, 490 U.S. 386, 397 (1989).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Id.* at 396 (internal quotations and citation omitted). Determining whether there has been a Fourth Amendment violation by an individual officer requires consideration of "(1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee." *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008) (citing *Graham*, 490 U.S. at 396).  "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'"  *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). Moreover, to determine whether the force exerted by a police officer is excessive, a court must "apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants."  *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

Civil liability will not attach, however, simply because an officer's conduct may be found to have violated one or more of a plaintiff's constitutional rights.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotations omitted).  A court need not address these two inquiries in any

particular order, and may choose first to determine whether a right was clearly established before deciding whether an officer's conduct on a particular occasion violated that right. *See Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009). "[U]nder either prong [of the inquiry], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

b.   *Analysis*

Rogers' excessive force claim begins with him standing outside of 8181 House, after having been stabbed in his shoulder and arm by Taylor. Importantly, although Rogers testified that Kelley had observed the physical struggle between Rogers and Taylor through a window and heard both of their screams (Rogers for help after having been stabbed, and Taylor screaming "let me go, let me go"), there is no evidence that Ryan, Morin or Brown were aware of these facts. Indeed, it seems undisputed that these officers arrived later, after Rogers was outside. Taking the facts in the light most favorable to Rogers, then, he was standing outside conversing with these officers for a few minutes, bleeding heavily and asking for help. He testified that he showed them he had no weapon, asked if he was under arrest and was told "no," and was told that "there were no medics in the area. No medics were coming[,] period." Rogers testified that, "[a]t that point, [he] made an attempt to go toward [his] neighbor's home" "and have them call for medics." Rogers claims, "that's when [] Sergeant Ryan grabbed me from behind and threw me to the ground." Then, allegedly, he was kicked and punched by Ryan, Morin and Brown, and had "pain compliance techniques" used against him. He further testified that even after he was handcuffed, Ryan "mashed" his face into the concrete ground.

Considering Rogers' testimony, as well as the other evidence of record, the Court concludes that Rogers' excessive force claim survives summary judgment. With respect to the

first *Graham* factor, there is a dispute as to whether, at the time the force was applied, Rogers was involved in a serious crime.  The Court first notes that Defendants do not dispute that it was Rogers, not Taylor, who called the police.  According to Defendants, they reasonably believed that Rogers had assaulted Taylor.  Specifically, Lieutenant Morin testified that, at the time Rogers refused their commands to get on the ground, he had "received information that it was [Rogers] that committed the domestic violence …."  (Doc. #132 at 26).  But, according to Rogers, he was initially thrown to the ground by Ryan not as he tried to flee the house after the altercation with Taylor, but after first spending 5-10 minutes standing in the driveway, conversing with Ryan, Morin and Brown, and asking for help for his severely cut arm.  Thus, there is at least a question of fact as to the first *Graham* factor.

With respect to the second *Graham* factor, Defendants assert that Rogers "had already struggled violently with his girlfriend," had "repeatedly ignored or refused to comply with Defendants' request to stop, halt, and lay down," and the incident "occurred late at night in a highly populated area on the Westside of the City of Detroit where he posed a threat to motorists, neighbors, and himself."  (Doc. #115 at 26).  Indeed, Sergeant Ryan testified that he responded to the scene because the initial responding officers – Kelley and Conley – apparently "felt they were threatened" and called for backup.  (Doc. #133 at 24).  The problem, however, is that the evidence, when viewed in the light most favorable to Rogers, raises questions about whether he posed a threat to the officers or others *at the time of* the officers' alleged use of force. Sergeant Ryan testified that, when he first appeared at the scene, he noticed that Rogers was bleeding and wounded.  (*Id.* at 18).  His Arrest Report similarly indicates that he "arrived at the scene and observed [Rogers] standing in the driveway of 8127 House surrounded by several officers.  Mr. Rogers had a severe cut on his left forearm that was bleeding profusely and

appeared to be disorientated."  (Doc. #115-1 at 1).  And, as noted above, Rogers and Defendants offer very differing views of what happened after he exited the home.

Taking the facts in the light most favorable to Rogers, where he was unarmed, bleeding profusely from a serious stab wound, conversing with the officers over a 5-10 minute period of time and requesting medical assistance, and then walking towards his neighbor's home, there is at least a question of fact as to whether Defendants reasonably perceived sufficient danger to the arresting officers or to the community at large to engage in the conduct of which they are accused.

Finally, Defendants argue that the third *Graham* factor weighs in their favor because Rogers "continuously refused to comply with the police's commands, fled from their control, and otherwise resisted arrest."  (Doc. #115 at 26).  In evaluating this factor, however, courts focus on whether plaintiffs are *actively* or *passively* resisting arrest.  *See Eldridge v. City of Warren*, 533 F. App'x 529, 534-35 (6th Cir. 2013).  According to the Sixth Circuit, active resistance "can take the form of 'verbal hostility' or 'a deliberate act of defiance'"; in contrast, passive resistance includes the refusal to comply with orders and is "not sufficient to legitimize the officers' use of force."  *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) (quoting *Eldridge*, 533 F. App'x at 534-35).

Ultimately, the Court finds that this aspect of Defendants' motion fails in a few respects, although some more clearly than others.  First, Rogers denies that Ryan told him to stop as he walked to his neighbor's home, and he denies ever trying to run from the officers.  (Doc. #115-6 at 76, 79-80).  That, coupled with Rogers' testimony that as he was walking to his neighbor's home, Ryan grabbed him from behind and threw him to the ground, raises a question of fact about whether that alleged act was "excessive force."  Similarly, Rogers testified that Ryan

"mashed" his face into the concrete ground even after he was in handcuffs, stripping the skin off his face.  This, too, raises a factual question which prevents the Court from granting summary judgment as to this particular portion of Rogers' excessive force claim.  *See Kalvitz v. City of Cleveland*, 763 F. App'x 490, 494 (6th Cir. 2019) (noting that arresting officers "cannot use heightened force against [arrestee] once they have placed him in handcuffs"); *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996) ("beating and kicking restrained suspects who are in the control of the police is 'plainly excessive' force").

The more complicated issue is with respect to the period of time between when Ryan allegedly threw Rogers to the ground and when Rogers was handcuffed.  Defendants argue that during this period of time, Rogers was actively resisting arrest because he engaged in deliberate acts of defiance by ignoring police commands to "lay face down on the ground" and to put his hands behind his back.  (Docs. #132 at 21; #162 at 51, 52; #133 at 38-39).  Defendants also maintain that Rogers ran away from police and – even after being caught and brought to the ground – refused to present his hands to be handcuffed.  (Docs. #123-1 at 13, 17, 28-29, 33; #115-1 at 1).  If Defendants' testimony is credited, Rogers' conduct could certainly be viewed as actively resisting arrest, as the Sixth Circuit has held a "'deliberate act of defiance' using one's body can constitute active resistance, such as where a suspect resist[s] arrest by 'laying down on the pavement and deliberately locking his arms together tightly under his body while kicking and screaming.'"  *Goodwin*, 781 F.3d at 326 (quoting *Eldridge*, 533 F. App'x at 534-35).  In *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015), police arrested a suspect for driving with a suspended license.  The suspect initially refused the arresting officer's instruction to place his hands on his truck, and the suspect twice jerked his hands away from the officer.  *Id.* at 640.  The suspect then "ball[ed] up" and admittedly refused to allow the officer to handcuff him.  *Id.*  After the first

officer delivered an unsuccessful knee strike, another officer warned the suspect that he would be tased if he did not comply.  When the suspect ignored the warning, he was tased.  The Sixth Circuit found no constitutional violation, noting, "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."  *Id.* at 642.

But Rogers disputes the officers' testimony that he ran away from them – indeed he claims he was not even able to run due to a recent surgery he had on his ankle.  He claims that he simply stood in the driveway "[s]creaming for help" and asking for medical care, and that he had been standing there with them "five, almost ten minutes" before he started walking toward his neighbor's home to seek help.  Rogers further testified that, after he was brought to the ground by Sergeant Ryan, he was not trying to resist the officers' attempts to handcuff him.  Rather, while he admits he "heard officers screaming and hollering at [him], telling [him] to lay face down on the ground," he claims he "told the officer, sir, I've been stabbed.  I'm disabled, and I have placement rods in my right ankle.  There's no way possible that I can lay down, face down on the ground."  (Doc. #115-6 at 81).  Further, he claims that the reason he did not immediately place his hands behind his head is because he was trying "to cover [his] face because [he] was being punched and kicked." (*Id.* at 82; *see also id.* at 93).

As this Court recently recognized, "[w]here the basic facts that bear on the immunity defense – such as whether the plaintiff 'actively resisted' officers, or offered no resistance – are hotly disputed, and where the record evidence could support either side's story, judgment as a matter of law on qualified immunity is precluded."  *Hermiz v. Budzynowski*, No. 16-11214, 2017 WL 2546793, at *10 (E.D. Mich. June 13, 2017).  Again, Rogers' testimony is hotly disputed by the Defendants, but the question of which version of events to believe is fundamentally a

question for the jury.  At the summary judgment stage, where the Court must take the facts in the light most favorable to Rogers, a reasonable juror could conclude that Rogers was not actively resisting arrest at the time the force was applied.

Moreover, even if consideration of the *Graham* factors did compel a conclusion that *some* amount of force was justified, a jury could reasonably conclude that, in light of the circumstances, the amount of force used by Defendants was disproportionate to the resistance Rogers displayed.  In assessing the proportionality of force administered, the relevant factors include, but are not limited to, "the need for the force, the degree of force applied, the injuries inflicted, and totality of the circumstances surrounding the use of force."  *Landis v. Baker*, 297 F. App'x 453, 462 (6th Cir. 2008).  In this case, even crediting Defendants' assertions that Rogers was "resisting" their efforts to subdue and restrain him, the degree of force applied under the circumstances could be seen as disproportionate.  While the Court recognizes that the events in question took place late at night and involved a domestic dispute that had turned physical, under Rogers' version of the facts, during the salient time period he was unarmed, bleeding profusely from a stab wound, and (as Defendants seem to have recognized from their initial interactions with him) in need of prompt medical attention.  Nonetheless, Rogers alleges that three police officers – Ryan, Morin, and Brown – teamed up to apply enough force to bring him to the ground, administer a knee strike to his back, and then repeatedly punch and kick him, and gratuitously grind his face into the pavement after he was handcuffed.  Considering the totality of the circumstances, if the jury credited Rogers' version of the events, they could conclude that the force used was disproportionate to any resistance he offered.

For all of these reasons, viewing the facts in the light most favorable to Rogers, which the Court is required to do at the summary judgment stage, a reasonable juror could conclude

that, other than Kelley,[9] Defendants used excessive force on the night in question.  The right to

be free from such gratuitous acts of excessive force was clearly established at the time of the

events in question.  *See Correa v. Simone*, 528 F. App'x 531, 535 (6th Cir. 2013) (the right to be

free from physical force when one is not resisting the police is a clearly established right).  Thus,

other than as to Kelley, Rogers' excessive force claim is not barred by qualified immunity, and

summary judgment is not appropriate.[10]

### 3.    *Rogers' Deliberate Indifference Claim*

Rogers also claims that Defendants were deliberately indifferent to a serious medical

need when they "fail[ed] to call for and delay[ed] medical assistance" during the events in

---

[9] With respect to Officer Kelley, the analysis is different because there is no evidence that she actively participated in the alleged use of force.  If an officer does not directly participate in the challenged conduct, "there must be a showing that [she] either supervised the [officers] who did so or owed [the plaintiff] a duty of protection."  *Burgess*, 735 F.3d at 475.  Here, where there is no allegation that Kelley supervised the other officers, Rogers must establish that she owed him a duty of protection.  To establish such a duty, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used *and* had both the opportunity and the means to prevent the harm from occurring."  *Id.* (emphasis in original) (internal quotations omitted).  Here, the undisputed evidence shows that Kelley is entitled to summary judgment on this issue.  Officer Kelley indicated in discovery responses that, after Rogers "fled from the location," she "stayed with [Taylor] because [Taylor] had two small children in the house" and, thus, she "did not see the remaining events unfold."  (Doc. #123-1 at 51).  Rogers similarly testified that after he had exited from the house, "Serina Kelley went to go talk to Yvette Taylor" back inside the house.  (Doc. #115-6 at 76).  And, when asked to identify the "officers that were there" during the beating that allegedly took place a few minutes later, Rogers testified, "Morin, Michael Conley, Jeffrey – Jeffrey Morin, Michael Conley and Sergeant Ryan.  John Does 1 and 2, they were standing back and watching."  (Doc. #115- 6 at 82).  Rogers' own testimony, therefore, belies any claim that Kelley had the opportunity and the means to prevent the alleged harm from occurring.  Thus, Kelley is entitled to summary judgment on Rogers' excessive force claim.

[10] Rogers also pleads a state law claim for assault and battery.  "Under Michigan law, an officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested to the extent the force used was excessive."  *McGrew v. Duncan*, 333 F. Supp. 3d 730, 742 (E.D. Mich. 2018) (internal quotations omitted).  Because the Court has determined that a material issue of fact exists regarding Rogers' excessive force claim, there likewise is a triable issue of fact as to whether the force asserted was reasonable.  Thus, other than as to Kelley, summary judgment should be denied as to this claim, as well.

Rogers also asserts a claim for negligence.  This claim, based on the same allegations that form the basis for his claim of excessive force, is subject to dismissal because the Sixth Circuit has clearly held that "gross negligence" is not an independent cause of action for claims that sound in excessive force.  *See Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (rejecting gross-negligence claim against an officer-defendant because it was "undoubtedly premised on the intentional tort of battery" where it was based on a shooting that resulted in death).

question. (Doc. #28 at ¶ 41). "The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while being apprehended by police." *Scozzari v. Miedzianowski*, 597 F. App'x 845, 848 (6th Cir. 2015) (citing *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). As the *Scozzari* court explained:

> To establish a violation of the right to adequate medical care under 42 U.S.C. 1983, a plaintiff must show that the defendant acted with deliberate indifference to serious medical needs. A plaintiff need not show that the official acted for the very purpose of causing harm or with knowledge that harm will result. [D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.
>
> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [a plaintiff's] health and safety. A claim for deliberate indifference to serious medical needs has both objective and subjective components. The objective component requires proof of a sufficiently serious medical need. To establish the subjective component, a plaintiff must allege facts which, if true, would show that the official … subjectively perceived facts from which to infer substantial risk to the [individual], that he did in fact draw the inference, and that he then disregarded that risk. However, a plaintiff need not prove that the official acted for the very purpose of causing harm or with knowledge that harm will result if the official recklessly disregarded a known risk.
>
> Where a deliberate-indifference claim is based on delay of medical care, a constitutional violation arises if the injury in question is so obvious that even a layperson would easily recognize the need for a doctor's attention, and the resulting need for treatment was not addressed within a reasonable time frame.

*Id.* at 848-49 (internal quotations and citations omitted).

In this case, Defendants argue that summary judgment is proper on Rogers' deliberate indifference claim because he "received prompt medical care due to the injuries to [his] arm and head." (Doc. #115 at 30). Other than as to Kelley, the Court disagrees. As set forth above, Sergeant Ryan admitted that, when he arrived on the scene at 8181 House, he could see that Rogers was bleeding from a large laceration to his forearm. (Doc. #133 at 18, 26). Rogers testified that he spent 5-10 minutes talking to Ryan, Morin, and Brown, explaining that he had

been stabbed, had lost a lot of blood, and was having trouble breathing.  (Doc. #115-6 at 76).

Despite this, Rogers testified that he was advised that "[n]o medics were coming, period."  (*Id.* at

76, 77).  According to Rogers, when he then started toward a neighbor's house to "have them

call for medics," he was grabbed from behind, punched, kicked, and otherwise brutalized.  (*Id.* at

77-79, 82, 92, 94).  Taking the facts in the light most favorable to Rogers, then, there is a

question of fact as to whether Defendants, again, other than Kelley,[11] were deliberately

indifferent to a serious medical need, precluding summary judgment on this claim.

### 4.  *Rogers' Due Process Claim*

Although not pled particularly clearly, it appears that Rogers is also asserting a due

process claim stemming from the fact that he was allegedly detained for an extended period of

time without a probable cause determination.  Specifically, Rogers alleges as follows:

> 17.  Plaintiff was arrested 7-19-2013, Detroit Police then transported the
> Plaintiff from the hospital on 7-20-2013, Detroit police then transported
> the Plaintiff from the hospital in handcuffs to the 11th precinct to be
> "booked" and was charged with crimes Plaintiff declared he was innocent
> of.  Defendants charged Plaintiff with: Aggravated/Felonious Assault,
> Aggravated Assault, Resisting Off[ic]ers, Obstructing Police, these
> charges were "false" and "misleading."
>
> 18.  On 7-20-2013, Defendants submitted sworn affidavits of their
> complaint of these alleged "felony charges" against the Plaintiff to the
> Wayne County Prosecutor's Office requesting for a warrant for which was
> "denied" for lack of "probable cause"; therefore, charges were dismissed
> in favor of the Plaintiff for the defendants warrant-less arrest without
> cause.
>
> 19.  The Defendants would not release the Plaintiff nor would they take
> Plaintiff in front of a Judicial Magistrate District Judge for a PROBABLE
> CAUSE DETERMINATION for their invalid warrant-less arrest within

---

[11] As discussed above, *see supra* at 18-19, n. 9, the evidence is undisputed that after Rogers was
in the company of other officers on the driveway, Kelley was in the house checking on Taylor
and the children.  This was a reasonable action on Kelley's part, and Rogers makes no factual
allegations, and presents no evidence that Kelley had any improper motive or knew that the other
officers were going to engage in the acts alleged by Rogers.  Thus, as to Kelley, Rogers cannot
satisfy the subjective component of his deliberate indifference claim.

> 48 hours after the arrest was a requirement under Michigan Law.  To be
> clear, after the Defendants false arrest, the Plaintiff was deprived of DUE
> PROCESS, which then amounted to the Plaintiff's illegal detention from
> 7-19-13 thru 7-22-13.

(Doc. #137 at ¶¶ 17-19) (emphasis in original).  It appears, then, Rogers is alleging that

Defendants unlawfully detained him because he was kept in custody for "a period of four (4)

days" without a judicial determination of probable cause.  (Doc. #123 at 14).

"Both the standards and procedures for arrest and detention have been derived from the

Fourth Amendment and its common-law antecedents." *Gerstein v. Pugh*, 420 U.S. 103, 111

(1975) (citations omitted).  "To implement the Fourth Amendment's protection against

unfounded invasions of liberty and privacy, the Court has required that the existence of probable

cause be decided by a neutral and detached magistrate whenever possible." *Id.* at 112.  Although

the Constitution does not require a pre-arrest determination of probable cause (i.e., warrantless

arrests are permissible), "the Fourth Amendment requires a judicial determination of probable

cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 113-14.  If the

probable cause hearing is provided more than 48 hours after arrest, "the burden shifts to the

government to demonstrate the existence of a bona fide emergency or other extraordinary

circumstance." *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

Here, Defendants do not dispute Rogers' assertion that he was arrested and detained by

the DPD for more than 72 hours without a probable cause determination.  But, to impose

individual liability upon an officer for engaging in unconstitutional misconduct, the plaintiff

must "specifically link the officer's involvement to the constitutional infirmity[.]"  *Burley v.

Gagacki*, 834 F.3d 606, 615 (6th Cir. 2016) (internal quotations omitted).  Here, it is not clear

that any of the named defendants were responsible for Rogers' allegedly excessive detention, as

Rogers acknowledges he was taken from the hospital to the DPD's 11th precinct in the custody

of two *unknown* DPD officers. (Doc. #123 at 21).

The problem, however, is that Defendants did not move for summary judgment on Rogers' due process claim, nor did they argue or present evidence showing that the named defendants (1) had no control or influence over the length of Rogers' post-arrest detention, or (2) had no ability to bring Rogers before a judicial officer for a probable cause determination. Thus, while it is not clear on what evidence Rogers will rely to support this particular claim against Defendants, based on the present record, the Court cannot find that Defendants are entitled to summary judgment.

### 5. *Rogers' Intentional Infliction of Emotional Distress Claim*

Lastly, Defendants argue that Rogers' intentional infliction of emotional distress claim is barred by governmental immunity. (Doc. #115 at 31-32). Under Michigan's Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq.*, individual governmental defendants are entitled to immunity for intentional torts when (1) the acts were undertaken during the course of employment, (2) the employee acted or reasonably believed that he was acting in the scope of his authority, (3) the acts were performed in good faith or without malice, and (4) the acts were discretionary, not ministerial. *See Odom v. Wayne Cnty.*, 482 Mich. 459, 480 (2008). Here, however, the burden is on Defendants to establish that they acted without malice, and they have made no persuasive argument to this effect.[12] *Id.* at 475. ("The proponent of individual immunity must establish that he acted without malice"). Again, construing the facts in the light most favorable to Rogers, this claim survives summary judgment.

## II. RECOMMENDATION

---

[12] Although Kelley has met this standard with respect to Rogers' claims related to the alleged physical assault against him, as noted above, the Defendants did not address Rogers' due process claim. Accordingly, to the extent Rogers' intentional infliction of emotional distress claim hinges on conduct underlying his due process claim, Kelley would not be entitled to summary judgment.

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (**Doc. #115**) be **GRANTED IN PART** and **DENIED IN PART**.  All Defendants are entitled to summary judgment on Rogers' *Heck*-barred claims and his negligence claim.  Additionally, Defendant Kelley is entitled to summary judgment on Rogers' claims of excessive force, assault and battery, and deliberate indifference.  Defendants are not entitled to summary judgment on Rogers' other claims.

Dated: July 31, 2019                              s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                              United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be

concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 31, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
